UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————X

THE RDI CORPORATION,

              Plaintiff/Counter-Defendant,

     -against-

CHARTER COMMUNICATIONS, INC.,

             Defendant/Counter-Plaintiff

————————————————————————————X

No. 1:19-cv-10929

**UNDER SEAL**

## MEMORANDUM DECISION AND ORDER DISPOSING OF THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

McMahon, J.:

This case involves competing breach of contract claims arising out of the services agreement between the telemarketing company RDI Corporation ("RDI") and the telecommunications company Charter Communications, Inc. ("Charter").

Charter engaged RDI to conduct telemarketing campaigns. The contract between the two companies required RDI to comply with the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA"), which prohibits telemarketers from calling customers whose names appear on the national "do not call" ("DNC") registry. Charter provided RDI with a "lead list" consisting of the names of potential customers and existing customers who were being targeted for service upgrades. Charter had "scrubbed" the list for numbers appearing on DNC registries ("DNC numbers") before providing it to RDI; but RDI was required to "scrub" the list periodically as well, in case customers or potential customers had added themselves to a DNC registry after Charter sent the lead list to RDI.

In the spring of 2018, when Charter learned from routine monthly audits that RDI had placed a large number of calls to persons on DNC registries, it demanded details about how RDI was living up to its screening obligations. Dissatisfied with what it learned, Charter terminated its contract with RDI and refused to pay plaintiff the sum of $334,063.44, representing a portion of the sum that RDI was owed for services rendered during the period April-August 2018.

RDI filed this suit seeking to recover the money that Charter admittedly withheld. It seeks to recover that sum under multiple theories, including breach of contract and quantum meruit. Charter asserts that it owes RDI no money for services rendered during the April-August 2018 period, because RDI was in material breach of the contract.

Additionally, Charter filed two counterclaims against RDI for breach of contract. The first seeks unspecified damages for RDI's material breach of the parties' agreement by virtue of its "fail[ure] to comply with all applicable federal, state, local and municipal laws, rules and regulations while providing services under the Agreement." This breach (which consists of making calls in violation of the TCPA) allegedly took place in April 2017 and again in May and June 2018. The second counterclaim seeks unspecified damages for RDI's alleged "refus[al] to indemnify Charter" for costs that Charter incurred defending against a class action lawsuit brought by someone RDI should not have called but did call in April 2017.

The parties have cross moved for summary judgment. RDI moves for partial summary judgment as to liability only on its breach of contract claim, with damages to be ascertained at trial. It also moves for summary judgment dismissing both of Charter's counterclaims. (Dkt. Nos. 45, 46). Charter cross-moves for summary judgment dismissing RDI's claims and for summary judgment on the first of its two breach of contract claims. (Dkt. Nos. 50, 51). Charter asserts in its motion papers that, as damages for RDI's breach of contract, it is entitled to the return of every

penny it paid to RDI between January 2017 and August 2018 – over $12.2 million – on the theory that, if Charter had known in December 2016 that RDI was failing to scrub lead lists, it would have terminated RDI's contract in January of 2017, some twenty months earlier than it actually did. Charter has not cross moved for summary judgment on its claim for indemnification.

The motions are decided as follows:

(1) RDI's motion for summary judgment on Charter's breach of contract claim is DENIED.

(2) Charter's motion for summary judgment on its breach of contract claim is GRANTED.

(3) RDI's motion for summary judgment on Charter's indemnification claim is GRANTED.

(4) RDI's motion for partial summary judgment on its breach of contract claim as to liability is GRANTED.

(5) Charter's cross motion for summary judgment on RDI's claims is DENIED.

## FACTUAL BACKGROUND[1]

### A.     Parties

Charter is a cable television, telephone and internet services provider in the United States. RDI is a telemarketing company that provided telemarketing services to Charter.

### B.     The Master Services Agreement and Related Agreements

In 2014, RDI entered into a Master Services Agreement ("MSA") with Time Warner Cable enterprises, LLC ("Time Warner"). In 2016, Charter merged with Time Warner. Charter agrees that it became bound by the MSA after its merger with Time Warner.

The MSA provides that RDI would provide "telemarketing and related services" to Charter in connection with various marketing campaigns, for which Charter would compensate RDI in

---

[1] Unless specifically noted otherwise, the facts contained in this section are undisputed, as drawn from the parties' Rule 56.1 statement of undisputed facts and response statements. (*See* Dkt. Nos. 46-1, 51, 63, 70-1).

accordance with one of two payment models: an hourly model and a performance-based model

("Pay-for-Performance" or "PFP"). The payment model applicable to a given campaign was

detailed in a Statement of Work ("SOW") that governed RDI's engagement for that specific

campaign. For the time period and services rendered at issue in this case RDI was to be paid for

each qualifying Primary Service Unit ("PSU") sold and connected. Each line of service to which

an individual subscribed constituted 1 PSU for which RDI was to be paid at a tiered payment rate

that varied by month.[2]

RDI and Charter entered into at least five SOWs over the course of their relationship. The

parties agree that the SOWs provided the terms and conditions for specific telemarketing

"campaigns." Together, the MSA and SOWs constitute the parties' contractual arrangement (the

"Agreement").

The primary SOW – which provides the terms and conditions for all RDI's work on a

project called "Outbound Telemarketing for Sales Acquisition to Prospects and/or Current

[Charter] Customers" – is dated December 22, 2016 (the "2016 SOW"). (Dkt. No. 55-2, ¶ 5).

Subsequent SOWs, which were dated July 22, 2017, September 22, 2017, December 22, 2017, and

May 22, 2018, were "addendum SOWs," which expressly incorporated the terms of the 2016 SOW

and the MSA and provided that both of those documents "shall continue in full force and effect in

accordance with the provisions thereof," except as specifically amended. (*See* Dkt. No. 46-4).

These addendum SOWs amended the underlying Agreement, either by adding the terms of the

specific pay model applicable to a given calling campaign (the July 2017, September 2017, and

May 2018 SOWs) or by giving Charter the right to charge RDI a penalty of $1000 for each

---

[2] The parties explain that a third-party software platform called Optymyze was used to track the work RDI performed
and the payments Charter made to RDI. Optymyze was connected to Charter's internal billing systems and could pull
information from those systems about whether and when PSUs sold by RDI were connected and installed.

"Escalated Customer Action Form" received as a result of RDI's negligence or misinformation (the December 2017 SOW). (*See* Dkt. No. 70-1, at ¶¶6-9; *see* Dkt. Nos. 46-4).

For purposes of this lawsuit, the MSA and the 2016 SOW provide the relevant terms, as these terms remained in full force and effect for the duration of the parties' relationship and applied to every campaign RDI conducted for Charter. (*See e.g.*, Dkt. No. 55-3).

  *i.* *DNC Terms*

Section 1.1 of the MSA required RDI to "comply with all applicable federal, state, local and municipal laws, rules and regulations . . . including without limitation . . . the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ('TCPA')[.]" (Dkt. No. 46-4, at § 1.1). The TCPA's DNC rules prohibit companies from calling numbers on the national DNC registry. *See* 47 C.F.R. § 64.1200(c)(2). Penalties under the TCPA for violations of the DNC rules include minimum statutory damages of $500 for each actionable DNC call, and as much as $1,500 for each willful or knowing DNC violation. *See* 47 U.S.C. § 227(c)(5)(B). Fines for violations are assessed by the Federal Communications Commission ("FCC"), and the TCPA also creates a right of action for consumers and states to bring claims for statutory damages. *See* 47 U.S.C. 227.

Section 3 of the MSA sets forth the specifics about how the parties were to ensure DNC compliance. (*See* Dkt. No. 46-4). The MSA provided that, before sending a lead list to RDI, Charter would scrub the list to remove any customers who had asked Charter not to be contacted ("company specific" DNC requests). (*Id.* § 3.2). The 2016 SOW specified that Charter was "responsible for removing all leads qualifying for Do Not Call . . . treatment, as appropriate, from the national DNC list" before sending the list to RDI. (Dkt. No. 55-2, ¶7).

Once RDI got the list as scrubbed by Charter, it was required to do the following:

For each telemarketing campaign for which [RDI] is engaged to provide Services hereunder (as described in separately executed Statements of Work) (each a

"Campaign"), [Charter] will furnish [RDI] with one or more calling lists for such Campaign (each a "List"). Before making use of any such List(s), [RDI] will remove or "scrub" from the List(s): (a) telephone numbers that appear on any state do-not-call ("DNC") lists or registries that are applicable for that Campaign; and (b) telephone numbers that appear on the national DNC registry established by the FTC; and (c) any and all other DNC lists that may be required by applicable federal, state, or local laws, rules or regulations. Without limiting the foregoing, [RDI] agrees to "scrub" each List in accordance with the immediately preceding sentence at the start of the applicable Campaign and once a week thereafter while the Campaign is active, or more frequently if required by law.

(*Id.* § 3.1). RDI was to "scrub the file through a 3rd party vendor (PossibleNow)" and "repeat the PossibleNow scrub process again after 15 days for wireless phone numbers" and for "current and/or potential customers who may have recently added themselves to the [Charter] DNC list." (*Id.*). RDI was also "responsible for removing any leads that are on their [sic] own private company DNC list only." (*Id.*). RDI was only to place calls "to telephone numbers appearing on the [lead lists] after the [lists are] scrubbed against applicable Do-Not-Call lists and/or registries." (*Id.* at ¶6(c)(5)).

Thus, both the MSA and the 2016 SOW imposed scrubbing obligations on RDI as well as on Charter.

ii.    *Waiver and Modification*

Section 19 of the MSA states: "No consent or waiver by [Charter] with respect to any provision of this Agreement will be valid and effective unless made by a duly authorized officer of [Charter] in writing." (Dkt. No. 46-4, at §19). At no time did any duly authorized officer of Charter waive, in writing or otherwise, the contractual requirement that RDI scrub the lead lists.

Section 17 of the MSA states: "No amendment, waiver, change or modification of any of the terms, provisions or conditions of this Agreement will be effective unless made in writing and signed or initialed by the parties." (*Id.* at § 17). The record contains no written amendment or change to any contractual provision.

### iii.    Indemnification

In Section 15 of the MSA, RDI agreed to

> defend, indemnify and hold harmless [Charter] and its officers, directors, partners,
> affiliates, employees, agents, licensees, assignees, successors in interest and
> purchasers from and against any and all claims made or threatened by any third
> party and all costs, expenses . . . , claims, losses, liabilities, damages, and
> settlements ("Losses") arising out of or in connection with a third party claim
> relating to any inaccuracy, breach or violation (or claimed inaccuracy, breach or
> violation) of any of [RDI's] warranties or covenants in this Agreement or any
> Statement of Work . . .

(Dkt. No. 46-4 § 15.1).

And while Charter agreed to defend, indemnify, and hold RDI harmless for third-party claims "relating to the use of any calling list supplied by [Charter]," the MSA made it clear that Charter had no such obligation for any claims arising out of or relating to RDI's failure to comply with its obligations under the Agreement, specifically and "without, limitation, its obligations under . . . Section 3 ['Do Not Call Compliance'] . . ." (*Id.*).

As is customary, the MSA provides that the "Indemnifying Party" shall "have sole control over the defense of the claim and any negotiation for its settlement or compromise . . ." and may do so "using its own counsel at its own expense." (*Id.* at § 15.2). Section 15.2 of the MSA requires that Charter "promptly" notify RDI of any claim for indemnification. However, "any failure to make such prompt notification will not relieve the Indemnifying Party of its obligations hereunder *unless the Indemnifying Party's ability to defend such claim is materially prejudiced thereby.*" (*Id.*) (emphasis added).

### iv.    Audits

Under Section 13 of the MSA, Charter and/or a third-party auditor at Charter's request was permitted "to inspect and audit [RDI's] records and operations related to [RDI's] performance and regulatory compliance." (Dkt. No. 46-4 § 13.2). Charter was allowed to "require monthly . . . Do

Not Call audits" and RDI agreed to "comply with [Charter's] quality assurance requirements for each Campaign." (*Id.* at § 13.3).

       *v.*   *Termination*

Under Section 7 of the MSA, either party could terminate the MSA "and any or all Statement(s) of Work" for "convenience" or "for cause." Cause was defined as a material breach of the Agreement. Charter could terminate for "convenience" upon written notice "at any time." Charter likewise could terminate for cause (material breach) upon written notice if RDI failed to cure the material breach within 30 days of receiving written notice of the breach.

In this case, Charter terminated the contract with RDI by sending a written notice that did not specify the reason for termination. (*See* Dkt. No. 46-20). However, as the contract was effectively an "at will" contract from Charter's perspective, as long as written notice of termination was provided – and it was – there is no issue about the validity of the termination of the RDI/Charter business relationship.

## C.    RDI's DNC Compliance Between 2016-2018

RDI's IT director, Todd Young, was responsible for ensuring RDI's DNC compliance and responding to compliance audits on behalf of RDI. (*See* Dkt. No. 57-1, at 14:3, 26:12-17, 38:1-12; Dkt. No. 57-2, at 36:11-15; Dkt. No. 63, at ¶¶72. 74).

       *i.*   *RDI's Compliance With the TCPA*

Charter asserts in its counterclaim that, as a result of a lawsuit filed against it in April 2017, it became aware that RDI had called at least one number (plaintiff's) on the national DNC registry in violation of the TCPA.

This lawsuit ("the *Anderson* Lawsuit") was filed as a putative class action on April 27, 2017 in the Northern District of Illinois. (*See* Dkt. No. 46-22). Plaintiff alleged that Charter's

"telemarking calling operation" violated federal law [specifically, the TCPA] in that "robocalls" were made to the Plaintiff's cell phone, which was allegedly on the DNC registry. The plaintiff brought two claims under the TCPA on behalf of a three putative classes: (1) a "Called Party" class of persons who received one or more telephone solicitation calls from Charter on their cell phone, placed through an ATDS, without giving their express written consent to receive such calls; (2) a "Do-Not-Call" class of persons whose numbers were registered on the national DNC registry and received at least two telephone solicitation calls from Charter in a 12-month period; and (3) a "Revocation" class of persons who received one or more telephone solicitation calls from Charter placed through an ATDS who had expressly asked Charter to stop placing calls to that telephone number.

Prior to the filing of the *Anderson* Lawsuit – which is to say, for the first few months that the 2016 SOW was in effect – there is no evidence to suggest that Charter had availed itself of its right to audit RDI's compliance with contractual DNC protocols. At some point after the *Anderson* Lawsuit was filed, Charter began conducting monthly audits in accordance with Section 13 of the MSA. The parties differ over exactly when Charter's audits of RDI began, but they agree that, beginning in at least December 2017; a third-party vendor, CompliancePoint, conducted an audit of all calls made by RDI in each fiscal month, for the express purpose of tallying how many DNC calls RDI placed each month. (Dkt. No. 70-1, at ¶¶ 29-30). CompliancePoint then emailed RDI and Charter a report identifying the number of DNC calls made by RDI in that month. (*Id.*). After receiving an audit report, RDI would respond by email, explaining why calls had been made to DNC numbers. (Dkt. No. 70-1, at ¶32).

The only audit reports in evidence are those for May and June 2018, and the only information the Court has about earlier audits is a limited discussion of the December 2017 and

January 2018 audits in deposition testimony and emails. (*See e.g.*, Dkt. Nos. 46-2; 46-9; 46-10; 46-13). It appears that 97 calls were made to numbers on the national DNC list in December 2017 (Dkt. No. 46-9) and 138 calls were made to numbers on the national DNC list in January 2018. (Dkt. No. 46-10). These calls may have violated the TCPA, although no consumer appears to have filed suit as a result of being called. The record does not include any explanation RDI may have given for why these DNC calls were made. It is, however, undisputed that prior to May and June 2018 – and perhaps even as early as April 2017 – RDI was placing at least a small number of calls to numbers that appeared on national DNC registries, and Charter was aware that these calls had been made. (*See e.g.*, Dkt. No. 57-1, at 36:5-37:15).

Charter did not raise a red flag, however, until June 15, 2018, when CompliancePoint sent the preliminary results of its May 2018 audit. The audit showed that RDI had placed 1,477 to numbers that appeared on various DNC registries – including 1,152 to numbers that appeared on the national DNC registry. (*See* Dkt. No. 46-13). RDI claims that it made 2,097,030 calls in total during that month, which means that the DNC calls were an infinitesimal fraction – just 0.0007% – of the total number of calls placed. (Dkt. No. 46, at 5). But of course, even one DNC call subjected Charter to potential liability if the consumer chose to complain, and 1,152 violations of federal law (the total number of calls placed to numbers on the federal DNC list in violation of the TCPA) adds up to a potential liability for Charter of $1,728,000, were the violations to be found willful (up to $1,500 per violation).[3]

---

[3] Charter points out that the evidence is actually to the effect that CompliancePoint audited 2,097,030 "files," not "calls," and insists that there is no evidence equating "files" with "calls." I agree that, on the current record, the relationship between "files" and "calls" is unclear. (*See* Dkt. No. 70-1, at ¶39). However, even if every "file" does not represent a single "call," I would be surprised if 1,477 calls was not a small fraction of the total number of calls placed by RDI during the month of May. As to whether RDI breached the contract by placing these calls, that is entirely beside the point; as to whether the breach was material, it is an important point.

On June 29, 2018, RDI explained that the large volume of DNC calls in May 2018 occurred because of "a configuration problem from the setup." (Dkt. No. 63, at ¶ 54).

On July 2, 2018, Charter responded, "we are still not making any sense from you[r] explanation on why there were so many national and state DNC hits[.]" (*Id.* at ¶ 55).

On July 3, 2018, RDI indicated that the high number of DNC calls had actually resulted from "human error on the part of one of our IT staff." (*See* Dkt. No. 57-1, at 53 (RDI-00008190)). RDI represented that it was working to prevent similar occurrences in the future. (*Id.*). At his deposition, RDI's director of IT, Mr. Young, explained that this "human error" resulted from one of two things: either the leads lists were never loaded into PossibleNow or they were loaded into the wrong location in the software, which resulted in their not being scrubbed. (Dkt. No. 57-1, at 75:18-76:18, 101:9-15, 112:7-14).[4]

On July 12, 2018, Compliance Point sent the preliminary results of its June 2018 audit, showing RDI had made 678 calls to numbers on national and state DNC registries during June, including 568 calls to numbers that appeared on the national DNC registry – a better showing than in May, but still troubling. (*See* Dkt. No. 46-14; Dkt. No. 63, at ¶60). Again RDI claims that its DNC calls amounted to just a tiny fraction – 0.0002% – of the total number of calls it made during June (claimed to be 2,728,474), and while the equation between files and calls is unclear, I have absolutely no doubt about RDI's fundamental point that the number of errors was negligible in light of the total number of calls placed. Unfortunately, every error represented a violation of federal law.

On July 13, 2018, Charter and RDI held a conference call to discuss the June audit results. (Dkt. No. 63, at ¶61-62). In the conference call, RDI again explained that the errors resulted from

---

[4] Apparently, RDI does not know to this day what happened that led to the making of so many illegal calls.

a configuration problem and "human error," but again assured that it had taken steps to ensure it would not happen again.

Charter, unwilling to risk yet more exposure to liability, demanded that RDI sent Charter information about how it was fulfilling its DNC compliance obligations and what steps it was taking to prevent future DNC violations. (*Id.* at ¶65). On July 17, 2018, RDI sent Charter its TCPA compliance document and attachments related to RDI's DNC policy. None of RDI's procedures was specific to Charter or corresponded to the explicit requirements of the RDI/Charter contract – namely that RDI was responsible for scrubbing the file through a third-party vendor (PossibleNow) every 15 days during any given calling campaign. Moreover, all of RDI's procedures were created prior to May and June 2018 (Dkt. No. 63, at ¶¶66-67, 69) – which means they were not responsive to the errors made in May and June, and so could not have been not designed to correct those errors.

    ii.   *RDI's Non-Compliance with Scrubbing Obligations*

While Charter was aware that RDI had placed DNC calls as early as the filing of the *Anderson* lawsuit (one call) in April 2017, Charter was not aware that RDI was failing to scrub the lead lists as required by the MSA and the relevant SOW until July 2018. It was during that month that RDI first admitted it had not scrubbed lead lists in the months of May and June 2018.

During the course of this litigation, Charter learned that RDI's failure to scrub lead lists extended to and included the time period of December 2016 to October 2017. RDI's corporate representative testified in his deposition that RDI did not begin scrub Charter's lead lists prior to October 2017, because – the clear terms of the parties' agreement notwithstanding – it was his understanding that "Charter did all of the scrubbing" through Gryphon, Charter's program for scrubbing lead lists. (Dkt. No. 57-2, at 35:09-36: 10; *see* Dkt. No. 63, at ¶76). RDI's IT director

Mr. Young agreed that while "scrubbing [is] an important part of the telemarketing process" in order "[t]o prevent customers from being called that didn't wish to be called," RDI did not scrub any of Charter's lead lists between December 2016 and October 2017 – including specifically in April 2017 when the *Anderson* plaintiff was called – because Mr. Young "underst[ood] . . . Gryphon was in charge of that." (Dkt. No. 57-1, at 24:22–25:19, 63:11-17, 21-23). That, of course, is not at all what the MSA and the SOWs provide. The contract documents required Charter to scrub lead lists before providing them to RDI, but then required RDI to use a third-party service to scrub them again every fifteen days during the course of a calling campaign.

### D. Charter's Termination of the Parties' Agreement and Withholding of Payment

Once Charter learned RDI had not scrubbed lead lists in May and June 2018, it had had enough. On July 19, 2018, Charter sent RDI a letter terminating the parties' Agreement, effective August 21, 2018. (*See* Dkt. No. 46-20). The termination letter does not assign any reason for Charter's decision to termination of the Agreement. (*Id.*; *see* Dkt. No. 70-1, at ¶54).

Since termination of the Agreement, Charter acknowledges that it "has withheld $334,063.44 [in payment] from RDI." (*See* Dkt. No. 70-1, at ¶60; Dkt. No. 46-8 at 6).

### E. The *Anderson* Lawsuit

The *Anderson* lawsuit was, as noted above, filed by someone who was called despite being listed on the DNC registry in April 2017. Charter appeared by counsel of its choice on May 22, 2017. (Dkt. No. 70-1, at ¶70). Charter then litigated two motions to dismiss and a transfer of venue to the Eastern District of Wisconsin. *See Anderson v. Charter Comms., Inc.*, No. 2:17-cv-01684, at Dkt. Nos. 12, 17. After transfer, Charter, again through its chosen counsel, answered the amended complaint, asserting 37 affirmative defenses, including that unidentified "third parties"

were responsible for the harm and that Plaintiff was required to submit to binding arbitration under his agreement with Charter. *See id.* at Dkt. No. 40.

In March 2018, Charter had a telephone conference with RDI to discuss the "factual circumstances surrounding" any calls RDI might have made to Mr. Anderson. (Dkt. No. 70-1, at ¶71). This appears to have been the first contact between Charter and RDI concerning the lawsuit. RDI's corporate representative, Matthew Dowd, understood the call to be an "investigation to figure out the details of" "a complaint of some sort" involving a "particular customer," but was not told "it was a lawsuit." (Dkt. No. 71-2, at 77:8-78:1). He testified that customer complaints were common in the telemarketing industry, and RDI was often asked to give information about customers in response to complaints, but "typically, once we give the information, if we don't hear anything from the client, that is settled." (*Id.* at 83:20-25). Charter offers no evidence contradicting Dowd's testimony about what was said during this call.

It is undisputed that Charter did not make a demand for indemnification by RDI, either orally or in writing. There is no evidence indicating that RDI was contacted again about the *Anderson* lawsuit during its pendency.

On April 4, 2018, Charter's counsel deposed Anderson (Dkt. No. 70-1, at ¶77; *see Anderson*, No. 2:17-cv-01684, at Dkt. No. 43); on April 23, the Court held a Rule 16 status conference; on April 26, the Court entered a stipulated protective order; on May 4 and May 10, the parties served their Rule 26 initial disclosures (Dkt. No. 70-1, at ¶77). Two weeks later, on May 24, 2018, the parties stipulated to dismiss the case pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). (*Id.* ¶ 73).

Four months after the lawsuit ended, on September 6, 2018, Charter served on RDI an Indemnification Demand for $309,113.78 in defense costs incurred during the *Anderson* lawsuit.

(*See* Dkt. No. 46-21). On November 28, 2018, RDI denied that Charter was entitled to indemnification. (*Id.*). RDI contested the demand on the grounds that (1) there had been "no finding of any negligence or wrongdoing on the part of RDI," (2) "there has been no proper indication that the Lawsuit against Charter arose out of acts or omissions of RDI in the performance of its obligations under the Agreement" and (3) Charter failed "to promptly notify RDI of [its] claim," thereby effectively denying RDI its right to "have sole control over the defense of the claim and any negotiation for its settlement or compromise" in accordance with the terms of the MSA. (*Id.*).

### F.  Procedural History

RDI filed its complaint against Charter on November 26, 2019, asserting three causes of action: (1) breach of contract, (2) unjust enrichment, and (3) quantum meruit. (Dkt. No. 1). All sought the same relief: payment of the money that Charter had withheld when it terminated the contract. The complaint alleged, that under the parties' Agreement, RDI was to be paid by Charter for the sale of new and/or upgraded cable, internet and/or telephone services upon the installation of new and/or upgraded services sold by RDI to new or upgraded customers of Charter. RDI alleged that RDI had sole new and upgraded cable, internet and/or telephone services during the period March 1, 2018 through August 15, 2018 for which Charter had not paid RDI.[5] RDI alleges that, instead of making complete payment after RDI's termination, Charter made "unilateral partial payments to RDI of amounts [Charter] claimed were due and owing to RDI," which RDI contended was "significantly less" than the amount it was owed. RDI did not allege an exact amount that

---

[5] While the complaint alleges that RDI was not paid from and after March 1, 2018, the parties' motion papers on summary judgment discuss only April through August 2018 and all the evidence presented relates to that period. I conclude that RDI has abandoned any claim for non-payment during the month of March 2018.

remained unpaid; it simply asserted that it had been damaged in an amount exceeding $75,000, the jurisdictional minimum for diversity jurisdiction in a federal court.

Charter notified the Court by letter on three occasions that the parties were trying to resolve the dispute. (*See* Dkt. Nos. 14, 17, 19). When these discussions failed, Charter filed its answer, asserting, among other defenses, excuse, on the ground that any alleged breach by Charter was excused by RDI's earlier material breaches.

Charter also asserted two counterclaims for breach of contract: one for RDI's alleged "material breach" – its "fail[ure] to comply with all applicable federal, state, local and municipal laws, rules and regulations while providing services under the Agreement" – in April 2017 and in "2018;" and a second for RDI's alleged failure to indemnify Charter for the costs it had incurred in connection with the 2017 lawsuit. (Dkt. No. 24). Charter alleged that RDI's first material breach of the Agreement occurred in April 2017. Charter's pleading did not specify how RDI materially breached the Agreement, other than to say RDI failed to comply with applicable law; however, as Charter alleges that the *Anderson* lawsuit was filed as a result of RDI's material breach, one can fairly assume that it was RDI's failure to scrub the lead lists, and the resulting calls to DNC numbers, that underlay this allegation. This supposition is supported by Charter's allegation that "the conduct that precipitated the Lawsuit proved not to be an isolated occurrence, though Charter did not know it at the time," which lines up with Charter's assertion that it did not learn of the extent of RDI's failure to scrub lead lists until the events that led to the termination of RDI's contract.

In its reply (Dkt. No. 28), RDI denied any alleged misconduct or violation of the law. RDI also points out repeatedly that Charter's non-specific allegations left RDI "without knowledge of

when or what Charter" was alleging constituted a material breach or violation of the law.[6]

On March 6, 2020, the Court set a schedule for discovery (Dkt. No. 27), which was later extended due to the Covid-19 pandemic (*see* Dkt. No. 36). Discovery closed on January 28, 2021.

On March 1, 2021, the parties informed the Court that they had agreed to pursue mediation. (Dkt. No. 41). Any hope for a resolution was short-lived, however, and on March 26, 2021, RDI filed motions for sanctions against Charter and for summary judgment in its favor, both on its own claim (as to liability only) and dismissing Charter's counterclaims. (Dkt. Nos. 43, 45). The same day, Charter moved for summary judgment dismissing on RDI's claims and for judgment in its favor on its material breach (but not its indemnification) counterclaim. (Dkt. No. 50). And on April 30, 2021, Charter countered with its own motion for sanctions against RDI. (Dkt. No. 78).

On December 22, 2021, the Court denied the parties' motions for sanctions. (Dkt. No. 110).

On January 11, 2022, RDI's counsel advised the Court that they had been fired by their client and asked to be relieved. On January 24, 2022, the court ruled that the application would be granted, but advised the parties that the fully-briefed motions were in the process of being decided and deferred actually relieving counsel until a decision issued. (Dkt. No. 115).

## LEGAL STANDARD

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. At summary judgment, the movant bears the initial burden of

---

[6] Of course, we left the pleadings behind long ago in this lawsuit; the parties have taken extensive discovery and Charter's allegations have been fleshed out amply.

demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004).

"Where, as here, there are cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (quoting *Morales v. Quintel Entm't Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)). Once the movant meets its burden, the non-movant may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 248; *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). To survive summary judgment, the non-movant must present concrete evidence and rely on more than conclusory or speculative claims. *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir. 1980).

## DISCUSSION

At the heart of the cross-motions before the Court are the competing breach of contract claims.

Under New York law, a plaintiff must prove the following elements to prove breach of contract: "(1) an agreement; (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Donohue v. Cuomo*, 980 F.3d 53, 67 (2d Cir. 2020) (citation omitted). In a breach of contract case, "Summary judgment is appropriate if the terms of the contract are unambiguous." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d. Cir. 2011) (citing *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008)). "'[I]f the inferences are certain, the question involves only a matter of law and is to be decided by the court.'" *Riviera Finance of Texas, Inc. v. Capgemini US, LLC*, 511 Fed.Appx. 92, 95 (2d Cir. 2013) (summary

order) (quoting *Anderson Clayton & Co. v. Alanthus Corp.*, 91 A.D.2d 985, 985 (2d Dep't 1983)).

The first element is admitted. There is no question in this case that there was a valid agreement between the parties.

As to the second element, there is no dispute that each party did some of what it was contractually bound to do. It is undisputed that RDI performed telemarketing services for Charter until August 21, 2018, making millions of telephone calls and obtaining new customers for Charter while persuading some existing customers to upgrade their service. (*see* Dkt. No. 70-1, at ¶60). Charter provided RDI with lead lists scrubbed in accordance with its obligations and paid RDI for its services, to the tune of $12.2 million. (Dkt. No. 63, at ¶¶81, 83).

However, the undisputed facts also make clear that both parties failed in some way to uphold their end of the bargain.

RDI contracted to carry out its work in compliance with the DNC requirements of the TCPA. It also agreed to scrub lead lists periodically, according to a specific procedure, in order to achieve that compliance. However, the *Anderson* lawsuit and subsequent audits that were carried out monthly starting in December 2017 revealed that RDI was calling numbers on the national DNC registry, potentially in violation of the TCPA; and RDI admits that it failed to scrub the lead lists prior to October 2017 (*see* Dkt. No. 70-1, at ¶52), as well as in May and June 2018. (*See* Dkt. No. 57-1, at 75:18-76:18, 101:9-15, 112:7-14).

For its part, Charter admits it withheld $334,063.44 in payment for services rendered by RDI between May and August 2018. It contends that it had no obligation to make those payments, because RDI was in material breach of its obligations under the parties' contract. (*See* Dkt. No. 70-1, at ¶60; Dkt. No. 46-8 at 6; Dkt. No. 53, at 12 n. 8).

I. **RDI's Motion for Summary Judgment on Charter's Breach of Contract Counterclaim is DENIED; Charter's Motion for Summary Judgment on Its Breach of Contract Counterclaim Is GRANTED to the Extent of Liability and Nominal Damages.**

Charter has proven the existence of an agreement, its performance (payment), and a breach by RDI. RDI admits it failed to scrub lead lists between December 2016 and October 2017, as well as in May and June 2018, although it was contractually required to do so. Moreover, the undisputed evidence shows that RDI called DNC numbers as a result of its failure to scrub lead lists, including placing the call to Anderson in or about April 2017, as well as from and after December 2017. Charter has thus demonstrated a breach of contract, which entitles it to at least an award of nominal damages. *See Coastal Power v. Transcon. Cap.*, 10 F. Supp. 2d 345, 364 (S.D.N.Y. 1998) ("[A]ny breach of contract entitles the injured party at least to nominal damages[.]").

However, Charter does not seek nominal damages for this breach of contract. It seeks $12.2 million in damages, representing repayment of all sums that it paid to RDI between January 2017 and August 2018. Unfortunately for Charter, as a matter of law, it has no basis to claim repayment of all monies paid to RDI for services rendered through that period of the contract. (Dkt. No. 63, at ¶ 81, 83).

Charter's claim for $12.2 million in damages rests on a counterfactual: Charter argues that it would have terminated the contract with RDI as early as December 2016 – before it made those payments – had it known that RDI was in breach of the parties' Agreement. RDI counters that allowing Charter both to retain the benefits of the many customer contracts RDI procured for it – and to do so without paying RDI a dime for its efforts -- would place Charter in a far better position than it would have been if the contract had never been breached. RDI contends that Charter did not sustain any losses as a result of the relatively few DNC calls it made and argues that Charter profited mightily from the many customer contacts that RDI obtained for it. (Dkt. No. 46, at 20; Dkt. No. 65. at 12). On the record before the court, RDI is correct: Charter has submitted no

evidence of any losses suffered as a result of the DNC calls, and it has made no showing that the

DNC calls adversely impacted the revenue stream Charter earned as a result of sales made by RDI.

Charter claims it faces *potential* exposure to legal liability, including approximately $3.2

million in potential TCPA liability, as well as unquantified damage to its reputation. (*See* Dkt. No.

46-5, at 185:16–190:3; Dkt. No. 70-1, at ¶ 48). But Charter submits no evidence that the FCC has

assessed any fines against Charter for TCPA violations; and Charter's Corporate Representative

admitted in his deposition testimony that any TCPA liability was only "future liability." (*See e.g.*,

Dkt. No. 46-5). Aside from the *Anderson* lawsuit (which was dismissed with prejudice after

discovery),[7] there is no evidence that Charter has ever been sued under the TCPA as a result of

RDI's failure to scrub the lead lists. Charter suggests it is facing "other class action lawsuits in

which RDI's calls could be used against Charter" (Dkt. No. 71-4), but it has not identified any

such lawsuits or amended its indemnification counterclaim to include them. The only such lawsuits

of which the court is aware were filed in 2019 and 2020 and relate to calls that RDI could not

possibly have placed, because they were made after RDI's contract was terminated.[8] (*See* Dkt. No.

---

[7] To the extent Charter might contend that it has been damaged by paying attorneys' fees, its claim is barred by virtue of its failure to seek indemnity from RDI in a timely manner; *see infra.* pp. 22-23.

[8] RDI (not Charter) submits the pleadings from three putative class actions filed against Charter. In *Connor v. Charter Communications, Inc.*, No. 6:19-CV-02008 (D.S.C., filed July 18, 2019), the plaintiff alleges that he received telemarketing calls for Charter services in April and May 2019. In *Moore v. Charter Communications, Inc.*, No. 1:20-cv-00980 (N.D. Ill., filed Feb. 11, 2020), the plaintiff alleges that he received telemarketing calls for Charter services in November 2019. In *Kyle v. Charter Communications, Inc.*, No. 4:20-cv-00062-SRB (W.D. Mo., filed Jan. 28, 2020), the plaintiff alleges that he received telemarketing calls for Charter services in December 2019 and January 2020). While each of these lawsuits have an alleged class period of "any time within the four years prior to the filing of this action," RDI's evidence and public record further shows that the *Connor* and *Moore* lawsuits have already been already dismissed with prejudice, while the *Kyle* plaintiff has filed a notice that the parties have reached a settlement in principle and are currently finalizing that agreement. Since none of these cases was certified as a class action and all of them involve calls that occurred well after RDI ceased working for Charter, none of them has anything to do with RDI. And indeed, Charter's demand that RDI indemnify it in connection with these three matters was rejected on precisely that ground – that the offending calls to the named plaintiff were made after RDI's contract was terminated. (*see* Dkt. No. 46-18). Charter has neither amended its counterclaim to assert any breach arising out of RDI's rejection of the demand for indemnification in connection with these lawsuits nor included in its cross-motion papers any mention of those actions, which simply confirms that the statement made in the text – that, aside from *Anderson*, there is no evidence Charter has ever been sued under the TCPA as a result of RDI's actions – is correct.

46-18). Charter is of course correct that the statute of limitations has not yet run on all of RDI's bad calls – the statute of limitations for the TCPA is 4 years, and some of those calls were made by RDI during the period February-August 2018. But "potential" liability for TCPA violations resulting from calls made prior to February 2018 no longer exists; and if Charter is ever sued as a result of calls made by RDI between February 1 and August 21, 2018, it can always assert a claim for indemnification against RDI. (*See* Dkt. No. 46-4, at § 15).

Finally, Charter has offered absolutely no evidence of any harm to its reputation as a result of RDI's conduct, so that dog won't hunt.

"'The general rule for measuring damages for breach of contract has long been settled. It is the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract.'" *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1995) (quoting *Adams v. Linblad Travel, Inc.*, 730 F.2d 89, 92 (2d Cir.1984)). "In implementing this general rule, [the Second Circuit has] stated that when computing damages for a defendant's wrongful conduct, 'if any benefit or opportunity for benefit appears to have accrued to the plaintiff because of the breach, a balance must be struck between benefit and loss, and the defendant is only chargeable with the net loss.'" *Id.* (quoting *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 852 (2d Cir.1987)).

The Court agrees with RDI that Charter is not entitled to the windfall that repayment of the amounts paid RDI throughout the term of their contract would represent. Such repayment is impermissible as a matter of law because it would place Charter in a better position than it would have been if the contract had never been fulfilled. Here, RDI secured new and upgraded customer contracts for Charter over a year and a half; and Charter paid RDI for services that were in fact rendered. Charter does not dispute that it gained customer contracts and profits from the services

RDI rendered and it has not indicated that it intends to jettison those customers. To the extent of providing Charter with new and upgraded business, RDI fulfilled its part of the bargain; there is no reason why Charter should be allowed to retain that benefit without paying for it.

On the record before the court, Charter has only demonstrated an entitlement to the nominal damages that are a consequence of any breach. Charter's motion for summary judgment is, therefore, GRANTED, and it is awarded nominal damages. RDI's motion for summary judgment dismissing Charter's material breach of contract claim is DENIED.

## II.   RDI's Motion for Summary Judgment Dismissing Charter's Counterclaim for Indemnification is GRANTED.

RDI moves for summary judgment dismissing Charter's indemnification counterclaim because Charter did not make a timely claim for indemnification for the *Anderson* lawsuit as required by the MSA. The Court agrees that RDI is entitled to summary judgment dismissing this claim.

A contractual obligation "to give timely notice" must be provided pursuant to the terms of the contract and is not satisfied by the "doctrine of constructive notice" or an indemnitor's "actual knowledge of the claim." *Ins. Co. of the State of Pa. v. Argonaut Ins. Co.*, 2013 WL 4005109, at *10 (S.D.N.Y. Aug.6, 2013) (quoting *Roofing Consultants, Inc. v. Scottsdale Ins. Co.*, 273 A.D. 2d 933, 944 (4th Dep't 2000)).

It is undisputed that Charter did not provide notice or make a written demand for indemnification in accordance with its contractual obligations until four months after the *Anderson* lawsuit was resolved. Notice was finally given on September 6, 2018. Instead, Charter chose to defend against the *Anderson* Lawsuit using its own counsel, at its own expense.

As a result, it is also undisputed that RDI was denied the opportunity to defend the *Anderson* lawsuit. By failing to notify RDI of the lawsuit at its inception, Charter denied RDI its

contractual right to sole control of and participation in the defense of the lawsuit. Section 15.2 of the MSA states that "any failure to make . . . prompt notification will not relieve the Indemnifying Party of its obligations hereunder *unless the Indemnifying Party's ability to defend such claim is materially prejudiced thereby.*" (Dkt. No. 46-4 § 15.2) (emphasis added).

Charter claims RDI suffered no prejudice because there was a "good outcome" in the lawsuit. But that argument focuses on the wrong type of prejudice. Per the terms of the contract, RDI suffers prejudice if its *ability to defend against the lawsuit* is materially prejudiced – a form of prejudice that in no way depends on the *outcome* of the litigation. RDI had no opportunity to control the defense of the claim, because the lawsuit was over before RDI learned of its existence. RDI was, therefore, prejudiced in the very manner proscribed by the contract.

Moreover, while Charter views the outcome of the lawsuit as "good," had RDI been promptly notified, the result might have been better. Charter is seeking to saddle RDI with more than $300,000 in legal fees (*See id.* at 72:20-22). As RDI's corporate representative testified in deposition, RDI has no way of knowing today "what steps we would have taken" had it had the opportunity to defend the suit; whether it could have achieved an outcome even more favorable; or whether it could have saved on defense costs (which, given the nature of the lawsuit and its ultimate disposition, do seem excessive) by using its own lawyers. (*See* Dkt. No. 71-2, at 72:6-73:12). That is precisely why, per the MSA, prejudice arises, not from the outcome of the lawsuit, but from RDI's inability to control its defense.

Because Charter's counterclaim is limited to the *Anderson* lawsuit, and because Charter failed to provide RDI with notice of the claim as required by the parties' Agreement and RDI was prejudiced in its ability to defend against the lawsuit as a result, RDI is entitled to summary judgment dismissing Charter's claim for indemnification, with prejudice.

III.    **RDI's Motion for Partial Summary Judgment on its Breach of Contract Claim is GRANTED as to Liability; Charter's Motion for Summary Judgment Dismissing RDI's Breach of Contract Claim is DENIED.**

RDI seeks summary judgment in its favor on its claim for breach of contract arising out of Charter's admitted failure to pay RDI $334,063.44 in respect of services rendered between May-August 2018. Charter insists that payment was excused because RDI was in "material breach" of the Agreement by virtue of failing to scrub telemarketing leads "for months after the 2016 state of work went into effect" and "for the months of May and June 2018," and for placing "hundreds of calls to numbers on Do-Not-Call ('DNC') registries." (Dkt. No. 70, at 1,6). It is undisputed that the $334,063.44 is only in respect of the last four months of the contract.

A non-moving party "who relies upon an affirmative defense to defeat an otherwise meritorious motion for summary judgment must adduce evidence which, viewed in the light most favorable to and drawing all reasonable inferences in favor of the non-moving party, would permit judgment for the non-moving party on the basis of that defense." *Frankel v. ICD Holdings S.A.*, 930 F.Supp. 54, 65 (S.D.N.Y. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Charter cannot rely on RDI's admissions that it did not scrub lead lists between December 2016 and October 2017 in order to excuse the non-payment of sums due and owing for the period beginning in April 2018. Charter admits that it first learned of RDI's failure to scrub the lists in discovery while this lawsuit was pending -- well after it decided to withhold payment for the last few months of RDI's services. Charter's belated awareness of RDI's failure to scrub in 2017 is nothing more than "after acquired evidence," which cannot be used to rationalize its own failure to pay for services rendered during an entirely different time period in 2018.

Charter "fails to point to any New York law that allows a party to defend [against] a breach of contract based on conduct occurring before the breach, but not discovered until afterwards." *Rockland Exposition, Inc. v. Alliance of Automotive Service Providers of New Jersey*, 894

F.Supp.2d 288, 342 n. 49 (S.D.N.Y. 2012). That is not surprising. While after-acquired evidence
is sometimes relevant to the defense of a breach of contract claim, its admissibility is limited,
principally, to proving that *termination* of a contract was justified. For example, in *Daytree at
Cortland Square, Inc. v. Walsh*, 2021 WL 3190384 (E.D.N.Y. Jul. 28, 2021), Judge Block found,
on a summary judgment motion, that after acquired evidence *could be* used to defend against a
breach of contract claim where the alleged breach was the unjustified termination of the contract.
*Id.* at *5. Specifically, Judge Block held that the "breach of contract claim [challenging the
termination of the parties' contract] cannot stand in light of [plaintiff's] prior, material breach"
where defendant introduced after-acquired evidence that plaintiff was in violation of prevailing
wage laws at the time the contract was terminated. *Id.* Similarly, in *Rockland Exposition, Inc. v.
Alliance of Automotive Service Providers of New Jersey*, 894 F.Supp.2d 288 (S.D.N.Y. 2012), my
colleague Judge Karas explained that after-acquired evidence cannot be used as a "post-hoc
rationalization for [a] breach" but only as proof of cause for termination where there is an express
"for cause" termination provision in the contract. *Id.* at 342 n. 49. The doctrine also comes into
play in the employment context, where after-acquired evidence of a prior material breach can be
used both as a defense to a claim of wrongful termination of an employment contract and to cut
off damages. *See Hinchliffe v. Costco Wholesale Corporation*, 2010 WL 11537927, at *4 (D. Vt.
Feb, 19, 2010) (finding in breach of employment contract case, "after-acquired evidence may be
admitted to establish a complete bar to liability").

Here, Charter is not accused of wrongfully terminating the contract; it is undisputed that
Charter could terminate the contract for any reason or no reason on thirty days' written notice,
which it gave. Rather, Charter is accused of breaching the contract for failing to pay for services

that were indisputably rendered while the contract was in force. After-acquired evidence does not allow Charter to retain the services it has already received and accepted without paying for them.

No doubt anticipating this ruling, Charter argues that "even if the Court were to ignore RDI's complete failure to scrub leads and instead consider only RDI's illegal DNC calls in May and June 2018, even those calls constitute a material breach of the Parties' Agreement, precluding summary judgment for RDI." (*See* Dkt. No. 70, at 7)

"Under New York law, a party's performance under a contract is excused where the other party . . . has committed a material breach." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016); *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). "The determination of the materiality of a breach is . . . an issue of law for the Court." *Int'l Gateway Exch., LLC v. W. Union F. Servs., Inc.*, 333 F. Supp. 2d 131, 143 (S.D.N.Y. 2004).

"Whether a failure to perform constitutes a 'material breach' turns on several factors, such as the absolute and relative magnitude of default, its effect on the contract's purpose, willfulness, and the degree to which the injured party has benefitted under the contract." *Process Am.*, 839 F.3d at 136 (citing *Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88, 96 n.9 (1974)). A material breach is one "that goes to the root of the agreement between the parties and is so substantial that it defeats the object of the parties in making the contract." *Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp.2d 383, 414 (S.D.N.Y. 2004) (cleaned up) (quoting *Felix Frank Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)).

Viewed against this standard, RDI's breach, while serious, was not "material" in the sense that would excuse Charter's non-payment.

The purpose of the contract was for the conduct of telemarketing campaigns that would generate new and additional business for Charter. To prevent customer abuse, Congress has

regulated the telemarketing industry, and made it a violation of federal law for even one telephone call to be made to a customer whose telephone number has been placed on the federal DNC registry. It is undisputed that, in the telemarketing business, "Complying with the rules and regulations regarding calling individuals registered on do-not-call registries" is an "'important aspect of the telemarketing business and violations are extremely serious.'" (Dkt. No. 63, at ¶ 39 (quoting Dkt. No. 57-1, at 129:5–13)). The TCPA prohibits calling DNC numbers and imposes financial penalties for even one violation; both parties to this case agree that "scrubbing [is] an important part of the telemarketing process" in order, "to prevent customers from being called that didn't wish to be called or didn't want any contract with said client and/or client." (*See* Dkt. No. 57-1, at 24:22–25:19). Indeed, they recognized as much in their contract documents, which expressly required RDI to conduct its campaigns on Charter's behalf in accordance with federal law and made specific provision for when and how RDI was to scrub Charter's lead lists in order to remove numbers that appeared in DNC registries prior. Conducting Charter's telemarketing campaigns in accordance with the law was indubitably important to the parties' agreement, and RDI manifestly failed to perform, thereby exposing Charter to the prospect of legal liability that will not end until August of this year.

Nor is the absolute magnitude of RDI's breach insignificant. Each illegal call exposed Charter to a minimum of $500 in statutory damages. For the months in question – May and June 2018 – RDI's breach exposed Charter to a minimum of $860,000 in potential liability – substantially in excess of what Charter has admittedly failed to pay RDI. And RDI's failure to address in any meaningful way the defects in its compliance procedure when requested to do so by Charter rendered the magnitude of its breach significant.

Additionally, it is not simply the making of illegal calls that breached the contract. RDI's breach also lay in failing to scrub the call lists in May and June 2018, which quite possibly led to the making of those illegal calls. During those months, RDI failed to load the lists into the screening software in a proper manner, which resulted in the lists not being scrubbed. That, too, was a significant breach on RDI's part.

But a breach is only material when it is so substantial that it defeats the parties' objective. The purpose of the contract here at issue was to generate new or enhanced customer contracts for Charter;  and RDI's breaches, while indubitably serious, were neither "substantial" (which is not the same thing as serious or significant) nor did they "defeat the object of the parties in making the contract." As indicated above, the DNC calls were but an infinitesimal fraction of the calls that RDI made for Charter during those the months of May and June 2018.  And whatever its failings, RDI's breaches in May and June 2018 did not prevent RDI from obtaining new and upgraded customers for Charter during those months -- and thereafter, until the contract was terminated. The record does not indicate how many new or enhanced customer contracts RDI generated as a result of its thousands of calls, but Charter obtained the benefit of RDI's services. The object of the contract was not defeated; it was achieved.

Additionally, Charter's behavior between December 2017 and June 2018 strongly suggests that it did not deem the making of a few mistaken calls to qualify as a material breach. During those months, RDI was also calling DNC numbers, albeit only about 100 each month.[9]  Charter learned of these DNC calls during its monthly audits, which commenced no later than December 2017. But Charter did not deem the contract materially breached; it continued to audit RDI and it

---

[9] *See e.g.*, Dkt. No. 46-9 (97 calls made to numbers on the national DNC list in December 2017); Dkt. No. 46-10 (138 calls made to numbers on the national DNC list in January 2018).

accepted RDI's explanation for the few stray calls that were made. Only when the June audit revealed that the number of DNC calls had jumped dramatically in May of 2018 did Charter become alarmed. Charter's very failure to monitor RDI's performance until December 2017 – despite having the contractual right to conduct a monthly audit – also underscores the fact that it was not unduly alarmed by a small number of DNC calls.

Finally, the fact that Charter has not been damaged by RDI's breach suggests that the breach was not material. While the potential for TCPA liability on Charter's part will not expire for another seven months, there is no evidence in the record indicating that even a single complaint has been filed, let alone a lawsuit commenced, by any customer who was called illegally during the period for which Charter has withheld payment to RDI. The magnitude of the actual harm to Charter as a result of RDI's mid-2018 breach – at least thus far – appears to be non-existent. But the benefits Charter has received from RDI's performance are substantial. The relative magnitude of RDI's breach can only be described as negligible, and certainly not "so substantial" as to "defeat the purpose" of the contract.

The fact that the scrubbing errors in May and June of 2018 appear to be the result of technical and human error also cuts against a finding that RDI's breach in these months was willful. A willful breach includes "voluntary" or "intentional misconduct." *See Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985, 993 (S.D.N.Y. 1984); *see also* "Willful," BLACK'S L. DICTIONARY (11th ed. 2019). It does not include, however, a "slight, casual, or technical breach." *Process Am.*, 839 F.3d at 136 (quoting *Callanan v. Powers*, 199 N.Y. 268, 284 (1910)). Relatedly, while the TCPA does not define what constitutes a "willful" violation of the TCPA, courts have defined it as a "volitional or intentional" act or a *knowing* violation of the statute. *See Echevvaria v. Diversified*

*Consultants, Inc.*, 2014 WL 929275, at *9 (S.D.N.Y. Feb. 28, 2014), *R.&R. adopted* 2014 WL 12783200 (S.D.N.Y. Apr. 22, 2014). The word negligence appears in none of these definitions.

Here, the evidence does not support a finding that RDI engaged in intentional wrongdoing. While RDI's errors were careless, the evidence does not indicate that RDI intentionally or knowingly violated the TCPA during the months at issue. Of course, RDI's undisputed failure to take satisfactory steps to prevent this sort of failure from happening again could have rendered future violations willful. But Charter cut off the possibility of future violations by terminating the contract, which it was entitled to do.

RDI argues that this case is like that of *International Gateway Exchange, LLC v. Western Union Financial Services., Inc.*, 333 F. Supp. 2d 131 (S.D.N.Y. 2004), decided by this Court in 2004. There, the plaintiff sued Western Union for breach of the parties' agreement, claiming, among other things, that the defendant failed to complete sixty-four transactions. Granting summary judgment in favor of the defendant, this Court concluded that even if the defendant did not complete those sixty-four transactions – whether due to computer errors, technical glitches, or human error -- that "relatively small number of problems" did not "amount to a material breach of contract" as it was undisputed that the defendant provided services for "over 2600 successful card transactions." *Id.* at 143. The Court specifically noted that Western Union could not be expected to meet the "impossible standard of perfect performance." (*Id.* at 143). RDI argues here that its "imperfect" performance does not constitute a material breach of the agreement.

Charter counters that RDI's reliance on *International Gateway* is misguided because "the issue is not that RDI failed to complete . . . calls, but that it placed [hundreds of] calls in *affirmative violation of federal law* . . . " (Dkt. No. 70, at 8-9 (emphasis in original)). Charter also points out that in *International Gateway*, this Court found that the *plaintiff* International Gateway had

materially breached the agreement because it failed to "comply in all material respects with all banking and consumer protection laws and regulations," as the parties' contract required," in that it refused to obtain licenses required under the applicable banking and consumer protection laws as required by the parties' agreement. International Gateway also failed to make required minimum monthly payments owed Western Union under the agreement, to the tune of over $400,000. *International Gateway*, 333 F. Supp. 2d at 145–48. As a result, the plaintiff was both in payment default and was actively refusing to take "steps to bring itself into compliance" with banking and consumer protection laws, despite Western Union's repeated calls for the plaintiff to obtain the requisite licenses. *Id.* at 145. This breach not only placed consumer funds risk but raised "serious criminal law concerns" as well as regulatory concerns – all of which the plaintiff was aware of and deliberately flouted.

This case is not like *International Gateway* for several reasons. First, while RDI failed to comply with the TCPA, RDI did not willfully refuse to comply with the law or subject Charter to potential criminal liability, as the plaintiff did in *International Gateway*. There is no evidence that RDI's breaches were the product of anything other than negligence – inexcusable though that may be. Second, RDI did not otherwise refuse to carry out its obligations in providing services under the Agreement, as the plaintiff did in *International Gateway*. RDI in fact continued to call customers on Charter's behalf, which led to new and upgraded consumer contracts that generated revenue for Charter.

So while the evidence cuts both ways, I conclude, as a matter of law, that RDI's breach was not "material" in the sense that would justify Charter's nonpayment for services rendered by RDI that it accepted. The only thing that remains is for RDI to prove how much it is owed.

Because I find that RDI's breach in the months of May and June 2018 was not material, I need not reach RDI's argument that Charter waived its right to assert that RDI's breach was material because it was aware of RDI's non-compliance – at least with respect to placing calls to registered numbers – from at least December 2017, when CompliancePoint began monthly audits of RDI's DNC calls. However, the argument lacks merit. The MSA contains a waiver provision that requires any waiver of its rights be in writing, and no such waiver was ever executed. End of argument.

RDI stated in its moving papers that if it could collect what it was owed for each qualifying PSU it caused to be sold and connected, its claims for unjust enrichment or quantum meruit are moot. *See Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005) ("New York law does not permit recovery in quantum meruit . . . if the parties have a valid, enforceable contract that governs the same subject matter as the quantum meruit claim"); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."). Because the parties' contract governing the subject matter of these claims is enforceable, these claims – which were pleaded in the alternative – are indeed moot. I note, however, that if the contract had been materially breached, quantum meruit or unjust enrichment might well have been viable theories on which RDI could proceed, in order to prevent Charter from accepting the benefit of RDI's work without paying anything for that benefit.

RDI's motion for summary judgment in its favor on its breach of contract claim is granted as to liability only. We will hold an inquest on the issue of damages after RDI obtains new counsel (see below).

Charter's cross motion for summary judgment dismissing RDI's counterclaims is denied.

## CONCLUSION

RDI's motion for summary judgment dismissing Charter's breach of contract claim is DENIED. Charter's cross motion for summary judgment in its favor its breach of contract claim is GRANTED; when it is time to close the file on this lawsuit, judgment will be entered in Charter's favor for nominal damages. RDI's motion for summary judgment dismissing Charter's indemnification claim is GRANTED. RDI's motion for partial summary judgment on its breach of contract claim as to liability is GRANTED. Charter's cross motion for summary judgment dismissing RDI's claims is DENIED.

Having disposed of the pending motions, I will also today authorize the withdrawal of RDI's counsel of record effective ten days from today, on the ground that they have been fired by their client. I am making this order effective ten days from now because counsel of record need to comply with the requirements of the next to last paragraph of this opinion before I will let them off the case. It they wish to have a charging lien they should prepare the necessary paperwork.

RDI is advised that it cannot appear in this lawsuit *pro se*; it must obtain new counsel in order to finish this litigation (what remains being an inquest on the issue of damages). RDI has sixty days from today's date to appear by new counsel. If it does not do so, the court will issue an order to show cause why RDI's claims should not be dismissed.

Finally, this decision will temporarily be filed under seal. In accordance with this Court's prior order temporarily sealing certain documents pending decision on the summary judgment motions (Dkt. No. 110), the parties have ten days from this decision (*i.e.*, until February 10, 2022), to identify any portion of the papers, corresponding exhibits, and this decision that should remain under seal. Pages and paragraphs in this opinion and in briefs must be identified with specificity,

as must exhibits or portions thereof, and each designation must be accompanied by an explanation of why sealing should be permitted in light of the presumption of public access. After I have received any submissions, I will make the necessary rulings and this opinion will be publicly filed, either in its entirety or in appropriately redacted form.

This constitutes the opinion and order of the court. It is a written opinion. The Clerk is directed to close the motions at Docket Numbers 45, 46, 50, and 51.

Dated: January 31, 2022

_____
U.S.D.J.

BY EMAIL TO ALL COUNSEL